UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 06-CR-331 (DSD/SRN) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Billy Jo Fischer, | |
| Defendant. | |

Tracy L. Perzel, Esq., on behalf of Plaintiff

Andrea K. George, Esq., on behalf of Defendants

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-captioned matter comes before the undersigned United States Magistrate Judge on Defendant's Motion to Suppress Evidence Obtained as a Result of Search or Seizure (Doc. No. 12 ), and Motion to Suppress Statements, Admissions and Answers (Doc. No. 16.) This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

**I.   BACKGROUND**

An Indictment was filed on October 11, 2006, charging Defendant with one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 924(e)(1) and 922(g)(1). (Doc. No. 1.)

Sergeant Douglas Magnuson and Deputy Richard Rolffs from the Kandiyohi County Sheriff's

1

Office, Brian Cruze, an investigator with the Cee-VI Drug Task force and David Voth, a special agent with the Bureau of Alcohol, Tobacco and Firearms, testified for the Government at the criminal motions hearing. Defendant Billy Jo Fischer testified for the defense.

The following exhibits were received in evidence:

Govt. Ex. 1: A CD copy of Defendant's taped interview of August 23, 2006;

Govt. Ex. 2: A transcript of Defendant's taped interview of August 23, 2006; and

Govt. Ex. 3: A Kodak Disposable camera taken from Defendant's father's vehicle on October 20, 2005.

This matter is set for trial before United States District Judge David S. Doty on March 27, 2007.

## II.     FACTS

At about 9 p.m. on October 19, 2005, Sergeant Magnuson of the Kandiyohi County Sheriff's Office responded to a suspicious vehicle call regarding a vehicle towing a trailer containing a number of snowmobiles. When he reached the vehicle, a dark GMC Suburban ("the Suburban"), he found it parked with the lights on and the engine running. In addition, he observed two or three occupants in the vehicle. As Sergeant Magnuson activated his emergency lights, the driver exited the vehicle and approached him. Based on prior contact with the driver, Sergeant Magnuson identified him as Floyd Fischer, the father of the Defendant in this case. At some point, two more deputies arrived on the scene in response to a call for backup from Sergeant Magnuson. The officers eventually identified the passengers as Mary Smith and Steve Preslica.

Sergeant Magnuson arrested Floyd Fisher after determining that his driving privileges had been revoked. Mary Smith was then taken into police custody as well, as there was an outstanding warrant

for her arrest. Finally, as Mr. Preslica's license had also been revoked, pursuant to police policy, Sergeant Magnuson called a tow truck to impound the vehicle and the attached trailer. The deputies and Sergeant Magnuson conducted a cursory roadside search of the vehicle before it was towed, but seized nothing at that time. Defendant was not present throughout this encounter, nor did any of the Suburban's occupants mention that any of his property was located in the vehicle. The Suburban and the attached trailer were towed to Johnson Brothers Towing ("Johnson Brothers") in New London.

On October 20, 2005, Brian Cruze, an investigator with the Cee-VI Drug Task Force received an anonymous tip that the Suburban might contain drugs or guns. Investigator Cruze contacted Richard Rolffs, a deputy and canine officer with the Kandiyohi County Sheriff's office and requested that he bring his canine to Johnson Brothers. Shortly after his arrival, Deputy Rolffs deployed his canine to search the Suburban, attached trailer, and the three snowmobiles located thereon. The canine, which had received training in narcotics searches and tracking, quickly alerted to the presence of something in the hood of one of the snowmobiles. Deputy Rolffs then opened the snowmobile's hood cover and his canine pulled away some newspaper and a dryer sheet to reveal a handgun. Investigator Cruze took possession of the handgun. Deputy Rolffs testified that he did not file a report or an inventory return pertaining to this search, but stated that he did keep a log recording his canine's activities.

Investigator Cruze and Sergeant Tony Cruze, another officer present, proceeded to search the trailer and the Suburban. While no other evidence was collected from the trailer or the snowmobiles, Investigator Cruze's search of the Suburban returned two pieces of paperwork, each bearing the name of particular individuals, snowmobile registration forms indicating that the snowmobiles had been purchased at an auction, a Kodak disposable camera, a torch and a pill with markings. According to

Investigator Cruze, the documents were located on the floor of the vehicle, in the center console between the front seats, and in various seating areas. Investigator Cruze testified that none of these documents bore Defendant's name. He stated that the disposable camera at issue was recovered from the floor of the Suburban's cargo area, and it did not display any markings identifying its owner. He also testified that he found two duffle bags, but that there was no way to identify their owner.

Defendant testified that he had left the camera in an overnight bag in the Suburban, along with another bag, and that he expected his father to take the bags home. In addition, Defendant testified that the overnight bags contained paperwork which bore his name.

Neither Investigator Cruze nor Sergeant Tony Cruze filed an inventory report summarizing all of the items recovered from the vehicle. Rather, the camera and other evidence were placed in the evidence locker at the sheriff's office and Investigator Cruze recorded the evidence seized in his report.

The film was not developed until the first week of June, 2006, when the police sought to recover any evidence contained in the camera in preparation for the trial of Floyd Fischer, who had been charged with being a drug user in possession of the firearm found in the snowmobile. At the time the film was developed, the police had heard rumors that Defendant had been present in the vehicle earlier the night of October 19, 2005, but that he ran when law enforcement approached because there was a warrant outstanding for his arrest. Certain of the developed photographs depicted Defendant in possession of a firearm which, according to Investigator Cruze, was apparently the same firearm recovered from the snowmobile. Investigator Cruze testified that, in the post-seizure, pre-film development period, no one contacted the police about the items retrieved from the Suburban, and,

therefore, the police first believed that the camera might belong to Defendant only after developing the film contained therein.

In July 2006, the police conducted a trace on the firearm that was found in the snowmobile, and after locating the person who had purchased the firearm, the police learned that it had been stolen. Moreover, the police found a report concerning a burglary that had been conducted with the subject firearm. At that point, Defendant became the focus of a police investigation into whether he had been a felon in possession of the firearm.

Eventually, Investigator Cruze located Defendant at the Minnesota Department of Corrections' facility at Rush City, where he was serving an unrelated sentence. On August 23, 2006, he and Special Agent David Voth of the Bureau of Alcohol, Tobacco and Firearms interviewed Defendant at the correctional facility. At that time, no charges had been brought against Defendant regarding the firearm and Investigator Cruze testified that he was unsure if any charges would be brought. The interview had two purposes: 1) to date the photographs depicting Defendant in possession of the firearm; and 2) to identify his possible involvement, or that of others, in the burglary committed with the use of the firearm.

Both Investigator Cruze and Agent Voth wore plain clothes to the interview and neither carried a firearm. They conducted the interview in a twelve foot by twelve foot room with a table. Investigator Cruze testified that he could not recall whether Defendant was handcuffed. He further testified to having no concerns about Defendant's physical or mental condition. According to Investigator Cruze, throughout the interview, Defendant's answers were appropriate for the questions posed.

Agent Voth provided Defendant with his Miranda warnings at the interview's outset. Defendant nonetheless indicated a willingness to speak with Investigator Cruze and Special Agent Voth

to "see what this is all about." Defendant adamantly refuted any personal involvement in the burglary. In the course of the interview, Defendant informed the police officers that Albert Garcia was his attorney. The following exchange took place as the police officers showed Defendant the photographs developed from the seized camera:

Defendant: (inaudible) what, what if I did help you (inaudible)
Cruze: This one, this one, and this one..
Voth: Or we can talk to the attorneys.
Defendant: (inaudible) I mean make, put something on paper and come to me man, you know what I'm saying I know how the system works, put something on paper and come talk to me, talk to Albert Garcia, you know make a deal with him and then come talk to me, you know what I'm saying, sure I'll be willing to help you but I mean if you ain't got nothing on paper and I ain't getting out any sooner than you know February 26th than it ain't worth my .. you know. (inaudible) cause you know everytime I've ever worked with the police they've always, (laughs) I'm ending up here, you know what I'm saying, I'm sick of this dude, you know this shit is is just old man, I gotta, you know I got a little son out there I wanna, I wanna be part of his life man I've spent too many years in this ... in this institution and all it does is just..just waste my life away. I'm fuckin working in a kitchen making 12.5 cents an hour, I, I can't even, there ain't even nothing there I can do to learn a skill or a trade, you know I just, it's, it's bogus man, I wanna get out man. So if you can come at me with a good deal that you know what I'm saying you get me out sooner I'll help you, if not then I can't help you.
Cruze: Well..I..I don't think you're (sic) attorney or anybody can get you out of what you're at right now because you're ..you're executing a sentence that was, that a judge signed off on.
Defendant: Yeah, well then I guess this is where we're at I guess you know, not to be a dick, but hey.
Cruze: Well..I..I understand that.
Defendant: I gotta look out for my, my best interest you know .. you know?
Cruze: Well can you .. can you throw us a bone and give us this, I mean can you .. is it, are we talking you got the gun from somebody local or is it through another friend, I mean I understand that you..you don't hang in Meeker County.

The interview continued and Defendant confessed that he purchased the firearm from someone with whom he had grown up.

Defendant has filed a motion to suppress the photographs developed from the disposable

6

camera, as well as a motion seeking to suppress any incriminating statements that he made after the above exchange regarding the possible negotiation of a cooperation arrangement.

### III.  MOTION TO SUPPRESS THE PHOTOGRAPHS

Defendant argues that the Court should suppress the photographs developed from the disposable camera at issue because Defendant had a legitimate expectation of privacy in the camera, and, irrespective of the legality of the search for the camera itself, the development of the film constituted a separate, illegal, warrantless search under the Fourth Amendment.  (Def.'s Mem. Supp. Mot. Suppress at 10-11.)

The Government responds that Defendant did not have a valid privacy interest in the camera and, therefore, the development of the film, even if it constituted a separate warrantless search, was not illegal under the Fourth Amendment.  (Gov. Mem. Opp. Mot. Supp. at 4-8.)

A defendant has standing to challenge the admission of illegally obtained evidence only if the defendant's own constitutional rights have been violated.  See Rakas v. Illinois, 439 U.S. 128, 134 (1978).  Therefore, the defendant moving to suppress bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search.  United States v. Muhammad, 58 F.3d 353, 355 (8th Cir. 1995).  "To establish a legitimate expectation of privacy, the defendant must demonstrate: (1) a subjective expectation of privacy; and (2) that this expectation is one that society is prepared to recognize as objectively reasonable."  Id. *citing* United States v. Stallings, 28 F.3d 58, 60 (8th Cir. 1994).  In determining whether a defendant had a legitimate expectation of privacy regarding an object searched, courts consider the following factors:

> ownership, possession and/or control of the area searched or item seized; historical use

>of the property or item; ability to regulate access; [and] the totality of the circumstances surrounding the search.

United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994).

The Court first inquires into whether Defendant had a subjective expectation of privacy. In the present case, it appears that Defendant owned the camera and had used it in the past. He testified to placing the camera in the Suburban so that his father would take it home. Nonetheless, Defendant was not present in the vehicle on the night in question and, therefore, had no possessory interest in the camera at the time of the search. Moreover, he did not attempt to regulate access to the camera or even label it as his camera. Even if he had placed the camera in his overnight bag, he did not lock or mark the bag as to prevent access, or even identify the bag and the contents therein as his property. These factors strongly weigh against a subjective expectation of privacy. The Court finds that Defendant's lack of a possessory interest and failure to regulate access to the camera outweigh his ownership and historical use of the camera, and that Defendant, therefore, lacked a subjective expectation of privacy therein.

As Defendant lacked a subjective expectation of privacy in the camera, the Court need not address whether his subjective expectation of privacy was one that society is prepared to recognize as reasonable. Nonetheless, the Court will examine the second prong of the test. Defendant placed the camera in his father's Suburban, and it is well established that "a person has no reasonable expectation of privacy in an automobile belonging to another" – even as a passenger. United States v. Green, 275 F.3d 694, 699 (8th Cir. 2001) (citing Rakas v. Illinois, 439 U.S. at 148-49.) Here, it has not been established that Defendant was a passenger on the night in question. Therefore, he clearly placed the

camera in a location in which he had no legitimate expectation of privacy. In addition, none of the passengers in the Suburban informed the police that the camera was Defendant's property and no one claimed ownership of the camera between the time of its seizure and the development of the film. If Defendant wished to protect the camera's contents, he could have contacted police regarding its whereabouts. Finally, in examining the totality of the circumstances surrounding the search, the police developed the film in the camera as part of their investigation into possible offenses committed by Floyd Fischer, the owner of the Suburban. When the police interviewed Floyd Fischer regarding the ownership of the items in the Suburban, he did not inform them that the duffel bags or the camera were Defendant's property. Therefore, the police reasonably believed that the camera belonged to Floyd Fischer. Accordingly, any subjective expectation of privacy that Defendant may have had was not one that society is prepared to recognize as objectively reasonable. Therefore, the Court recommends that Defendant's motion to suppress be denied.

**IV.    MOTION TO SUPPRESS STATEMENTS**

The United States Supreme Court held in Miranda v. Arizona that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). The safeguards required are that any time a person is taken into custody for questioning "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. "Miranda holds that [t]he defendant may waive effectuation of the rights conveyed in the warnings provided the waiver is made voluntarily,

knowingly, and intelligently." Moran v. Burbine, 475 U.S. 412, 421 (1986).

**A.	Right to Counsel**

Defendant alleges that he invoked his right to counsel under Miranda when he requested that the interrogating officers negotiate with his attorney to reach an arrangement regarding his cooperation and therefore the officers should have ceased questioning at that time.  (Def. Mem. Supp. Mot. Suppress at 12-14.)  Defendant maintains that the Court, therefore, should protect his Fifth Amendment rights by suppressing any incriminating statements that he made following this request[1].  (Id.)

The Government argues that Defendant's reference to counsel was ambiguous or equivocal and, therefore, the interrogating officers' continued questioning of Defendant was appropriate.  (Gov't Mem. Opp. Mot. Suppress at 9-12.)

The right to counsel only attaches when a suspect invokes the right during custodial interrogation by making a clear and unequivocal request for counsel.  See Davis v. United States, 512 U.S. 452, 458-59 (1994) (holding that defendant's statement, "maybe I should talk to a lawyer," was ambiguous and did not require officers to clarify).  A suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  United States v. Davis, 512 U.S. 452, 459 (1994).  A defendant in custody who has invoked his right to counsel pursuant to Miranda may not be interrogated further, unless the defendant "initiates further communication, exchanges, or conversations with the

---

[1] At a later point in the interview, in response to Investigator Cruze's request that Defendant reveal the identity of the seller of the firearm, Defendant replied, "I'd like to talk to my lawyer."  The Government has agreed not to introduce into evidence any incriminating statements made by Defendant subsequent to this request for counsel.

police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).

The Court turns its attention to Defendant's proposal that Investigator Cruze and Agent Voth contact his attorney, Albert Garcia, to negotiate an arrangement regarding his cooperation. The threshold question is whether, in light of the circumstances, a reasonable police officer would have understood Defendant's proposal to be an unambiguous request for the presence of counsel during the interrogation.

Prior to Defendant's suggestion, Investigator Cruze and Agent Voth explained to him that they were seeking information regarding the theft of firearms and a burglary in Meeker County. Defendant himself was the one who broached the subject of cooperating in exchange for a reduction in the sentence for which he was incarcerated when he asked the officers, "(inaudible) what, what if I did help you (inaudible)." A reasonable officer could have construed Defendant's request that the police officers negotiate with his attorney as limited to that context only, i.e. the completion of a cooperation agreement that involved his early release from prison. That request is not the equivalent of a clear request for the presence of counsel at the interrogation table. It is not even a request by the Defendant to speak with his attorney, either in person or by telephone. As the Court finds that a reasonable officer under the circumstances would not recognize Defendant's proposal as an unequivocal demand for the presence of counsel during interrogation, the Court finds that the suggestion did not require the officers to stop questioning. United States v. Davis 512 U.S. at 462; See e.g. Dormire v. Wilkinson, 249 F.3d 801, 805 (8th Cir. 2001) (holding that "could I call my lawyer?" was not unequivocal); United States v. Segal, 207 F. Supp. 2d 835, 841 (N.D. Ill. 2002) ("you can talk to my lawyer" was ambiguous.); United States v. Whitefeather, 2006 U.S. Dist. LEXIS 17239, at * 29-33 (D.Minn.

January 17, 2006) ("Um, do you mind if I have my lawyer with me?" was equivocal).  Accordingly, the Court recommends that Defendant's motion to suppress be denied.

### B.      Right to Remain Silent

Defendant further argues that the Court should suppress any incriminating statements made after Defendant's proposal that the police officers negotiate with his attorney because his statement was also an unambiguous invocation of his right to remain silent, and, the police continued to question him in violation of Miranda.  (Def. Mem. Supp. Mot. Suppress at 12.)  The Government argues that this statement was, at best, an equivocal invocation of the right to remain silent and, therefore, was insufficient to establish a Miranda violation.  (Gov't Mem. Opp. Mot. Suppress at 8-12.)

It is well-established that government agents conducting interrogations must "scrupulously honor[ ]" a defendant's decision to invoke his right to remain silent and cut off questioning.  Michigan v. Mosely, 423 U.S. 96, 104 (1975).  The Eighth Circuit has held that a suspect must unequivocally invoke his right to remain silent in order to trigger the protections of Mosely.  Simmons v. Bowersox, 235 F.3d 1124, 1131 (8th Cir. 2001).  The invocation must be "a clear, consistent expression of a desire to remain silent."  United States v. Johnson, 56 F.3d 947, 955  (8th Cir. 1995) (internal citation omitted).

The Court finds that a reasonable officer would not construe Defendant's proposal that the police contact his attorney regarding the negotiation of a deal as an invocation of his right to remain silent.  Defendant never clearly indicated his desire to stop speaking with the police officers regarding the photographs or the burglary.  Rather, he indicated his mistrust of the officers' capacity to enter into a binding agreement which would secure his early release.  He therefore, requested that an arrangement

be made with his attorney in writing for that purpose. Accordingly, the Court finds that Defendant did not clearly invoke his right to remain silent. The Court recommends that Defendant's motion to suppress be denied.

**THEREFORE, IT IS HEREBY RECOMMENDED that:**

1. Defendant's Motion to Suppress Evidence Obtained as a Result of Search or Seizure (Doc. No. 12 ) be **DENIED**;

2. Motion to Suppress Statements, Admissions and Answers (Doc. No. 16) be **DENIED**.

Dated: February 15, 2007

    s/ Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by **March 5, 2007,** after being served with a copy thereof. The objecting party must file with the Clerk of the Court and serve on all parties, written objections which specifically identify the portions of the proposed findings, recommendations, or report to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.